In re Jose E. PANEM, Jr. SS# XXX–XX–2106, Debtor.

MBNA America Bank, N.A., Plaintiff,

v.

Jose E. Panem, Jr., Defendant.

In re Mary Linda Riley SS# XXX–XX–4179, Debtor.

Discover Bank, Issuer of the Discover Card, Plaintiff,

v.

Mary Linda Riley, Defendant.

Bankruptcy Nos. 05–42516–SBB, 05–51221–SBB. Adversary Nos. 06–01174–SBB, 06–01347–SBB.

United States Bankruptcy Court, D. Colorado.

Sept. 13, 2006.

Richard Ralston, Weinstein & Riley, P.S., Seattle, WA, Counsel for MBNA America Bank, N.A. and Discover Bank, Issuer of the Discover Card.

James T. Anest, James T. Anest, P.C., Parker, CO, Counsel for Jose E. Panem, Jr.

Mary Linda Riley, Denver, CO, pro se.

## AMENDED [1] MEMORANDUM OPINION AND ORDER

SIDNEY B. BROOKS, Bankruptcy Judge.

THESE MATTERS came before the Court on June 1, 2006, for a telephonic hearing regarding:

(1) the parties' Motion for Approval of Stipulation of Nondischargeability and Payment Plan, filed on March 14, 2006 (Docket # 5) ("Panem Motion for Approval of Stipulation"), in *MBNA America Bank, N.A. v. Panem,* Adversary Proceeding No. 06–01174–SBB, and the parties' Renewed Motion for Approval of Stipulation of Nondischargeability and Payment Plan, filed on May 2, 2006 (Docket # 11) ("Panem's Renewed Motion for Approval of Stipulation") (the stipulation, itself, in the *Panem* case shall hereinafter be referred to as the "Panem Stipulation"); and

(2) the parties' Motion for Approval of Stipulation of Nondischargeability and Payment Plan, filed on April 17, 2006 (Docket # 8) ("Riley Motion for Approval of Stipulation"), in *Discover Bank v. Riley,* Adversary Proceeding No. 06–01347–SBB (the stipulation, itself, shall hereinafter be referred to as the "Riley Stipulation"). For simplicity and clarity, the Riley Motion for Approval of Stipulation, the Panem Motion for Approval of Stipulation, and Panem's Renewed Motion for Approval of Stipulation, shall hereinafter collectively be referred to as the "Motions for Approval of Stipulations." In addition, the Riley Stipulation and Panem Stipulation shall be referred to as the "Stipulations."

### I. *Summary of the Decision*

The Motions for Approval of Stipulations and the Stipulations, themselves, re-

---

1. The original Memorandum Opinion and Order entered on August 3, 2006, is amended to clarify and enhance the ruling consistent with the Request for Reconsideration to Amend and Clarify the Memorandum Opinion filed by plaintiffs, MBNA America Bank, N.A. and Discover Bank on August 14, 2006 (Docket # 21).

solve separate, but factually and legally equivalent, adversary proceedings seeking a determination that certain credit card debt is not dischargeable under 11 U.S.C. § 523(a)(2)(A). The adversary proceedings are representative of many of the several hundred adversary proceedings filed related to bankruptcy cases opened during the "rush to file" immediately preceding the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").[2] Moreover, the Motions for Approval of Stipulations—and the Stipulations themselves—before the Court, are typical of those recently filed in countless other adversary proceedings. For the reasons stated herein, the Court declines to approve the Stipulations.

## II. *Background*

### A. *MBNA America Bank, N.A. v. Panem*

MBNA America Bank, N.A. ("MBNA"), filed a Complaint to determine the dischargebililty of debt owed to it by Jose E. Panem ("Mr.Panem"). MBNA contends that the obligation owing to it is nondischargeable under 11 U.S.C. § 523(a)(2)(A).

As alleged by MBNA, Mr. Panem entered into a contract with MBNA for a credit card account. As with the *Riley* case, while the Complaint and the record are unclear as to when the account was actually opened, it appears that the account had been open for a period of time prior to filing. On a single day, July 12, 2005, Mr. Panem incurred $9,500.00. in convenience check charges on the account. It appears that when the charges were incurred, the account had a credit limit of $10,200.00. Prior to these charges, the account balance was $0.00. Mr. Panem filed for bankruptcy relief on October 12, 2005. As of the petition date, Mr. Panem owed $9,893.38 on the account.

MBNA asserts that, under the "totality of the circumstances,"[3] Mr. Panem did not intend to repay the charges made on the card alleging that:

(1) the charges were incurred near the date of the bankruptcy filing;

(2) Mr. Panem was in poor financial condition;

(3) Mr. Panem indicated in his Statement of Financial Affairs, Questions 1 and 2, that he had an average yearly income of $18,094.75 in the three years prior to the bankruptcy filing;

(4) Mr. Panem was unemployed;

(5) the amount charged was high;

(6) Mr. Panem's charging habits changed since the account had a zero balance prior to July 12, 2005;

(7) charges *may* have been made for luxury goods and/or services;

(8) based on Mr. Panem's monthly income, monthly living expenses, and circumstances disclosed in the Schedules and Statement of Financial Affairs, no disposable income was available to pay the minimum monthly requirement on his unsecured debt;

(9) the minimum monthly payment on the $87,050.00 of scheduled unsecured debt exceeded the $1,741.00 per month income of Mr. Panem;

---

**2.** The provisions of the Bankruptcy Code referenced herein are to the Code pre-BAPCPA.

**3.** Counsel for MBNA, Richard Ralston, during the hearing on June 1, 2006, indicated that he and his client were relying on the "totality of the circumstances" test as enunciated in *Chevy Chase Bank FSB v. Kukuk (In re Kukuk),* 225 B.R. 778, 786 (10th Cir.BAP1998). The "totality of the circumstances" test is discussed in detail *infra* section IV(C)(2)(ii).

(10) Mr. Panem's Statement of Financial Affairs indicates that no losses from fire, theft, or gambling were incurred for the one year before the petition was filed;

(11) Mr. Panem's Schedule F does not disclose the date when unsecured debts were incurred;

(12) Mr. Panem is relatively sophisticated in business matters;

(13) other unsecured credit was also utilized;

(14) there were not sufficient liquid assets that could have been used to service the unsecured debt.

MBNA further contends that by incurring the charges on the account, Mr. Panem "represented an intention to repay them." MBNA alleges that Mr. Panem obtained the money through "fraud and false pretenses, false representations and/or actual fraud" and that he had a specific intent to defraud MBNA. Moreover, MBNA alleges that Mr. Panem's actions constituted a material misrepresentation of the facts, which he intended MBNA to rely upon, and that MBNA justifiably relied on those misrepresented facts.

Mr. Panem did not answer MBNA's Complaint. Instead, the parties negotiated and entered into the Panem Stipulation, whereby Mr. Panem agreed to pay the sum of $4,750.00 over the course of 36 months in installments of $131.94 per month, commencing May 15, 2006. By the terms of the Panem Stipulation, the debt alleged to be nondischargeable in MBNA's Complaint is reduced by approximately fifty percent, the interest rate is set at zero, and no attorney fees and costs are included in the settlement. In addition to the payment plan agreed to, a nondischargeable judgment in favor of MBNA and against Mr. Panem was to be approved and entered by this Court in the amount of $4,750.00.

The Court conducted a *sua sponte* telephonic hearing on the Panem Motion for Approval of Stipulation and Panem's Renewed Motion for Approval of Stipulation on June 1, 2006. Mr. Panem had counsel, Mr. James T. Anest, who reviewed and executed, with Mr. Panem, the Panem Stipulation. During the hearing, Mr. Panem was asked by the Court as to whether he understood the terms of the Panem Stipulation and whether he was conceding, explicitly or implicitly, that the sum agreed to be nondischargeable was obtained by "false pretenses, a false representation, or actual fraud." Mr. Panem denied any effort or attempt to defraud or deceive MBNA. Mr. Panem denied—without qualification—any false representations, any intent to defraud, or any misrepresentation whatsoever made to MBNA either before or after the unsolicited offer to use convenience checks.

Mr. Panem indicated that he did not have the money to fight the Complaint. His counsel echoed the same and stated that he reviewed this case with his client, and the cost and risk of defending this action, and concluded that it would be less expensive and time consuming to enter into a stipulation.

Mr. Panem also indicated during the hearing that he initiated a telephone call with MBNA to inquire further about an unsolicited offer he had received in the mail from MBNA to utilize MBNA convenience checks.[4] According to Mr. Pa-

---

4. In the Request for Reconsideration to Amend and Clarify the Memorandum Opinion filed by MBNA and Discover on August 14, 2006, counsel makes this inquiry: "Is not responding to an offer a seeking out of credit?" The Court concludes that a response to an unsolicited offer is not "a seeking out of credit." First, Mr. Panem already had avail-

nem, the loan was authorized over the course of the phone call. Mr. Panem's account statement reflects that the $9,500.00 was a "DIRECT DEPOSIT BA." [5] Evidently, all that was necessary to qualify for the loan was Mr. Panem's representations over the phone to MBNA regarding his prior income history and his hope for future commission income.[6] The record does not reflect that MBNA conducted any independent credit inquiry at that time.

Mr. Panem represented to the Court that used the funds advanced over the phone for necessary living expenses. Mr. Panem specifically denied that: (1) the charges were made for luxury goods and/or services, (2) that he was relatively sophisticated in business matters,[7] and (3) that he obtained the charges on the account by "false pretenses, a false representation, or actual fraud."

### B. *Discover Bank v. Riley*

Discover Bank, Issuer of the Discover Card ("Discover"), filed a Complaint to determine the dischargabililty of debt owed to it by Mary Linda Riley ("Ms.Riley"). Discover contends that the obligation owing to it is nondischargeable under 11 U.S.C. § 523(a)(2)(A).

As alleged by Discover, Ms. Riley entered into a contract with Discover for a credit card account. While the Complaint and the record is unclear as to when the account was actually opened, it appears that the account had been open for several years.[8] On August 9, 2005, Ms. Riley incurred $5,000.00 in unsolicited convenience check charges on the account. Prior to these charges, the account balance was $0.00. Ms. Riley filed for bankruptcy relief on October 16, 2005. As of the petition date, Ms. Riley owed $5,754.73 on the account.

Discover asserts that, under the "totality of the circumstances," Ms. Riley did not intend to repay the charges made on the card alleging that:

(1) the charges were incurred near the date of the bankruptcy filing;

(2) Ms. Riley was in poor financial condition at the time of the charges;

(3) Ms. Riley indicated in her Statement of Financial Affairs, Questions 1 and 2, that she had an average yearly income of $26,000.00 in the three years prior to the bankruptcy filing;

(4) the amount charged was high;

---

able credit of $10,200.00 at the time he received the unsolicited offer to use convenience checks. Thus, even if his response were construed as a solicitation or initiation of the process by Mr. Panem, it was not a "seeking out" of *additional* credit. Second, the point being made by this Court is that Mr. Panem received unsolicited convenience checks and he *responded* to MBNA's invitation, not the other way around.

5. Mr. Panem indicated that the loan was given to him over the phone. The account statement suggests that the funds were deposited directly into his bank account.

6. The statements of Mr. Panem were unclear as to whether he had a job at the time of this discussion with the MBNA representative.

His statements on the record also were equivocal as to what he told the Plaintiff about his current employment status and income picture at the time of the loan. It is clear that, either at the time of the loan or soon thereafter, he was or became unemployed. Thus, precipitating the bankruptcy case. His Statement of Financial Affairs and Schedules reflect that at the time he filed his bankruptcy, he had no commissions outstanding.

7. This denial seems a bit disingenuous since Mr. Panem states on his Schedule I that he is a "Financial Analyst."

8. Ms. Riley, in her letter response to the Complaint indicates that the account had been opened some time in 1989.

(5) there were numerous charges in a short period of time;

(6) multiple charges were incurred on the same day;

(7) bankruptcy counseling was sought on September 1, 2005;

(8) charges *may* have been made for luxury goods and/or services;

(9) based on Ms. Riley's monthly income, monthly living expenses, and circumstances disclosed in the Schedules and Statement of Financial Affairs, no disposable income was available to pay the minimum monthly requirement on the unsecured debt;

(10) the minimum monthly payment on the $64,000.00 of scheduled unsecured debt exceeded the $1,200.00 per month income of Ms. Riley;

(11) Ms. Riley's Schedule F did not disclose the date when unsecured debts were incurred;

(12) other unsecured credit was also utilized;

(13) there were not sufficient liquid assets that could have been used to service the unsecured debt.

Discover further contends that by incurring the charges on the account, Ms. Riley "represented an intention to repay them." Discover avers that Ms. Riley obtained the money through "fraud and false pretenses, false representations and/or actual fraud" and that she had a specific intent to defraud Discover. In addition, Discover alleges that Ms. Riley's actions constituted a material misrepresentation of the facts, which she intended Discover to rely on, and that Discover justifiably relied upon those misrepresented facts.

Ms. Riley filed a *pro se* letter response to the Complaint. In her response, she

denies that she defrauded, deceived, or had any intent to defraud or deceive Discover. She further represents that she had the card since 1989 and that she had a history of paying the balance on the credit card off each month.

Thereafter, the parties negotiated the Riley Stipulation, whereby Ms. Riley agreed to pay the sum of $2,500.00 over the course of 25 months in installments of $100.00 per month, commencing May 15, 2006. By the terms of the Riley Stipulation, the debt alleged to be nondischargeable in Discover's Complaint is reduced by approximately fifty percent, the interest rate is set at zero, and no attorney fees and costs are included in the settlement. In addition to the payment plan agreed to, a nondischargeable judgment in favor of Discover and against Ms. Riley was to be approved and entered by the Court in the amount of $2,500.00.

The Court conducted a *sua sponte* telephonic hearing on the Riley Motion for Approval of Stipulation on June 1, 2006. During the hearing, Ms. Riley was asked by the Court as to whether she understood the terms of the Riley Stipulation and whether she was conceding, explicitly or implicitly, that the sum agreed to be nondischargeable was obtained by "false pretenses, a false representation, or actual fraud." Ms. Riley indicated that she did not have the money to fight the Complaint and that was the reason that she was entering into the Riley Stipulation.[9] She denied that she obtained the convenience check charges on the account by "false pretenses, a false representation, or actual fraud."

Richard Ralston ("Mr.Ralston"), counsel for Discover, indicated that much of the justification for bringing the Complaint

---

9. It should be noted that Ms. Riley, counsel for the MBNA and Discover, and Jose Panem were not sworn and the statements made were not made under oath.

was based on a "totality of the circumstances," largely gleaned from Ms. Riley's Schedules and Statement of Financial Affairs. With respect to the question of "justifiable reliance" upon the alleged representations of Ms. Riley, Mr. Ralston informed the Court that, *generally,* credit card lenders will review a person's credit report *periodically* to make changes to the account or terminate the account. While he did not have the information available at the hearing, Mr. Ralston indicated that the "justifiable reliance" was based on this periodic review of a client's credit-worthiness.

## III. Issue

The issue before the Court is whether, under applicable law, these Stipulations respecting nondischargeability complaints for "false pretenses, a false representation, or actual fraud" should be approved by this Court. The Court concludes that it cannot approve the Stipulations and that a trial on the merits is warranted for the reasons stated below.

## IV. *Discussion*

### A. Initial Comments and Observations

The Court, having conducted a hearing to approve the Stipulations makes two initial observations and comments.[10]

First, these two Stipulations appear to be a product of, or some residue from, the "rush to file" bankruptcy under the old law prior to October 17, 2006. These Defen-

dants are not sophisticated in the law. From the facts of the cases, it appears that credit was given to these Defendants when they had very substantial debts and insufficient income to pay the debts. And, it appears from the facts thus far before the Court that this may well have been easily deducible from their credit records at the time credit was extended. The Defendants did not request an extension of credit; *they did not seek out or solicit the creditors for extensions of this credit.* Rather, the credit issued and the debt incurred was *solicited by the creditors from* these debtors when they were—it turns out—demonstrably financially desperate, but, according to the Defendants statements to the Court, hopeful and expectant for a more prosperous future.[11]

Second, both these Defendants indicated that an important—if not the paramount and decisive—factor in their decision to settle the lawsuits and enter into the Stipulations was to avoid the costs of litigation. Put another way, they could not afford to litigate; it was less costly to settle the case.

### B. The Court's Role in Evaluating the Stipulations

#### 1. *Authority for Reviewing the Motions for Approval of Stipulations*

■ The Stipulations at issue are essentially resolutions of two-party disputes. Consequently, some may suggest that this Court is not under the same obligation— or, *any obligation*—to review the Stipula-

---

**10.** Counsel for both MBNA and Discover, in these cases and in other cases before this Court, appears to be candid, competent, and diligent. These cases are *not* examples of cases where *counsel* for MBNA and Discover is attempting to extract, unscrupulously, a stipulation for payment of a debt that would normally be dischargeable (i.e. holding a bankruptcy case hostage for the payment of a

small debt). Each of the Defendants indicated that a significant if not the paramount and decisive factor in entering into the Stipulations was to avoid the time and expense of going to trial.

**11.** The financial state of each of these two Defendants was gleaned from their statements at the hearing.

tions as is required under FED.R.BANKR.P. 9019,[12] and the case law analyzing settlements thereunder, including *Reiss v. Hagmann*[13] and *Kaiser Steel Corp. v. Frates (In re Kaiser Steel Corp.)*.[14] This Court does *not* agree that there is *no* obligation—or a reduced obligation—on the part of this Court to review the Motions for Approval of Stipulations, the Stipulations, and the proposed orders and judgments in favor of the Plaintiffs and against the Defendants in the respective cases for a monetary nondischargeable judgment.[15]

First, the Motions for Approval of Stipulations were filed with this Court, thus implicating FED.R.CIV.P. 7.[16] Under FED.R.CIV.P. 7(b),

> A motion must state with particularity the grounds therefore and the relief or order sought. While this requirement is somewhat flexible, the motion must contain reasonable specificity. *Often a court will look to a motion's substance rather than its form in determining its effect.* Courts have been lenient regarding nonparticularized motions when the opposing party knew or had notice of the particularized grounds.[17]

By the express terms of FED.R.CIV.P. 7, there is the minimal pleading requirement of stating the relief sought with such particularity as to inform the reviewing court of its effect.[18] The implication thereof is that a court *must* review the content of the motion and its impact on the adversary proceeding.[19]

■ Second, the case law supports this Court's belief that the entry of an order approving a settlement and judgment in a section 523(a)(2)(A) adversary proceeding is not a mere "administrative" role, but an affirmative judicial act requiring discretion and good judgment. The Motions for Ap-

---

12. Rule 9019 addresses, generally, settlements in a bankruptcy case with the trustee or debtor-in-possession. Here, the settlement will directly impact only the two parties involved.

13. 881 F.2d 890, 892 (10th Cir.1989).

14. 105 B.R. 971 (D.Colo.1989).

15. Other courts have recognized this obligation also. In particular, the discussion in *AT & T Universal Card Service v. Bermingham (In re Bermingham)*, 201 B.R. 808 (Bankr. W.D.Mo.1996) addresses the court's role at length (*see* discussion *infra* ).

16. FED.R.CIV.P. 7 is made applicable to adversary proceedings by FED.R.BANKR.P. 7007. FED.R.CIV.P. 7(b)(1) provides, in part:
 An application to the court for an order shall be by motion which, unless made during a hearing or trial, shall be made in writing, shall state with particularity the grounds therefor, and shall set forth the relief or order sought.

17. 10 *Collier on Bankruptcy* ¶ 7007.04, at 7007–6 (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. rev.2005)(emphasis added).

18. A method used by some counsel to attempt to avoid this Court's review of a stipulation is to file a notice of dismissal or stipulation of dismissal. Seemingly, FED.R.CIV.P. 41(a)(1) would allow dismissal without Court Order— except in the context of a complaint wherein there is an objection to debtor's discharge. *See* FED.R.BANKR.P. 7041. If, however, dismissal is sought at the plaintiff's instance consistent with FED.R.CIV.P. 41(a)(2), this Court must review the stipulation and rule accordingly and "upon such terms and conditions as the court deems proper."

19. *See also* 11 U.S.C. § 105(a):
 The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

proval of Stipulations, the Stipulations, and the proposed orders filed are essentially submissions for consent judgments.[20] As the Colorado Supreme Court has held:

> A consent judgment is not a judicial determination of any litigated right, and it is not the judgment of the court, except in the sense that the court allows it to appear upon the record and having the force and effect of a judgment; it is merely the act of the parties consented to by the court.[21]

The judgment, if entered, is consequential as it becomes a final decree and order of this Court.[22] Moreover, it has the "judicial *imprimatur*" of the court.[23] The inherent powers of this Court, embodied in 11 U.S.C. § 105(a), impose a duty on this Court to ensure that the provisions of the Code are carried out and to prevent an abuse of process. In effect, this Court, if it does not review the terms and conditions of a submitted stipulation, the language of the motion to approve the stipulation, and the proposed order filed therewith, abdicates its duties.[24]

█ The Bankruptcy Court for the Western District of Missouri discussed the importance of the bankruptcy court's role in approving consent judgments in nondischargeability adversary proceedings:

The rendition of a judgment is a judicial act of this Court. The actual entry of a judgment, therefore, is an act requiring judicial authority. A consent judgment, likewise, is not a mere authentication or recording of an agreement between the parties; it is a judicial act involving an exercise of judicial power. A consent judgment, however, is distinguished from a judgment rendered on the merits, because it derives voluntarily from the parties, not from the considered judgment of the Court. As such, the Court exercises its judicial power by determining that the parties do, in fact, consent. A voluntary act of the parties to resolve their dispute is the most fundamental characteristic of a consent judgment. A valid consent judgment cannot be rendered by the Court if the consent of one party is wanting at the time the agreement becomes the judgment of the Court. Actual consent must exist at the very moment the Court acts to make the agreement the judgment of the Court. A judgment by consent cannot be supported merely because a party's consent was obtained at some previous time. Further, a party may revoke its consent at any time before the judgment is rendered ... This Court cannot enter a valid judgment based upon an agreement when the Court is informed

**20.** *Cf.,* FED.R.CIV.P. 68 (Offer of Judgment), made applicable to adversary proceedings by FED.R.BANKR.P. 7068.

**21.** *Marsh v. Warren,* 126 Colo. 298, 304, 248 P.2d 825, 828 (Colo.1952) (citation omitted).

**22.** *See* FED.R.CIV.P. 54, made applicable to adversary proceedings by FED.R.BANKR.P. 7054.

**23.** *Utility Automation 2000, Inc., v. Choctawhatchee Elec. Coop., Inc.,* 298 F.3d 1238, 1248 (11th Cir.2002)(citing, with emphasis in the original, *Buckhannon Bd. and Care Home, Inc. v. W. Virginia Dep't. of Health and Human Res.,* 532 U.S. 598, 605, 121 S.Ct. 1835, 1840, 149 L.Ed.2d 855 (2001)). The *Utility Automation* case deals with Rule 68 offers of judgment.

**24.** The Court would further note that, here, technically, Mr. Panem may be considered to be in default as he has not filed an answer. If this were to come before this Court on a motion for default judgment, the Court would take such evidence as necessary to determine the amount of damages or to establish the truth of the allegations contained in the Complaint as is necessary and proper. *See* FED.R.CIV.P. 55(b)(2), made applicable to adversary proceedings by FED.R.BANKR.P. 7055.

that one party no longer consents to the agreement ... [Moreover] it would be an abuse of the Court's discretion to approve an agreement when confronted with a clear and certain expression of a party's lack of understanding as to what was intended by the agreement.[25]

The Court, in *Bermingham*, went on to conclude that:

unless the entry of an Order approving a consent judgment is a meaningless, ministerial task, a Court is authorized to satisfy itself that debtor understands the terms of the agreement, that there is a reasonable basis for entry of the judgment on the terms agreed to by the parties, that debtor is aware of the right to a trial on the merits, and that debtor consents at the time judgment is rendered.[26]

This Court adopts and incorporates herein the review set forth in *Bermingham*.

###### 2. The Court's Concerns Regarding Settlements of 11 U.S.C. § 523(a)(2)(A) Complaints

Settlement of complaints seeking nondischargeability of credit card debt under 11 U.S.C. § 523(a)(2)(A) has many perils for debtors.

First, in many instances, the defendants in these cases are *pro se*, as is Ms. Riley. Moreover, by definition they are bankrupt, destitute and routinely unequipped—intellectually and financially—to litigate in bankruptcy court.

Second, credit card companies have the facility and access, through technology and automation, to instantly, easily, and inexpensively access a cardholder's most current and accurate credit information. They can, and often do so, when extending credit, increasing credit limits, or increasing a debtor's interest rate when the debtor makes a late payment on another creditor, mortgage, or another extension of credit. Certainly, the credit card companies can do so when sending unsolicited convenience checks or inviting a cardholder to transfer credit card balances.

Third, there is, generally, on the part of the defendants (*pro se* or otherwise) a lack of understanding of the stipulation and agreement and the defendants' appreciation of the implications, or the perception of settling a complaint wherein "false pretenses, a false representation, or actual fraud" is alleged. Settlement of a section 523(a)(2)(A) complaint is implicitly, if not explicitly, an acknowledgment of the fraud claims embodied in that section of the Bankruptcy Code. It is, absent language to the contrary, an admission of misconduct in the nature of "false pretenses, a false representation, or actual fraud." As a practical matter, if not a legal question, the credit community's view and the general perception of settling a claim predicated on fraud—as here—is that fraud, deceit or some wrongful conduct, is implicitly acknowledged by the defendant, if not actually explicitly admitted. As the Honorable A. Bruce Campbell has noted in *Rodriguez v. Valencia (In re Valencia)*:

We cannot agree with a rule under which, through alchemy of a settlement agreement, a fraudulent debtor may transform himself into a nonfraudulent one, and thereby immunize himself from the strictures of section 523(a)(2)(A). The weight of recent authority rejects (the novation) approach because it is contrary to the public policy embodied in § 523(a)(2)(A) of preventing fraudulent debtors from escaping their obligations

---

**25.** *AT & T Universal Card Service v. Bermingham (In re Bermingham)*, 201 B.R. 808, 816 (Bankr.W.D.Mo.1996) (citations omitted).

**26.** *Id.* at 817 (citation omitted).

at the expense of innocent defrauded creditors.[27]

The consequence or inference flowing from Judge Campbell's decision is that, *even if the Stipulations herein expressly provided that, by agreement of the parties, there is no admission of "false pretenses, a false representation, or actual fraud" these claims may survive and retain the character and stigma of the original allegations—now stipulated to.*[28]

### C. Standards for Approving a Stipulation

■■■ Although this Court acknowledges that FED.R.BANKR.P. 9019 does *not* apply in the context of this sort of adversary proceeding, the case law thereunder setting forth standards for approving settlements is informing and helpful to this Court's analysis. A court's decision of whether it should approve a settlement must be an informed decision, based upon an objective evaluation of the developed facts.[29] "An approval of a compromise, absent a sufficient factual foundation, inherently constitutes an abuse of discretion."[30] As this District has stated:

> In general, the court must determine whether the settlement is fair and equitable and in the best interest of the estate. To make this determination, the court should consider the probable success of the litigation on the merits, any potential difficulty in collection of a judgment, the complexity and expense of the litigation and the interest of creditors in deference to their reasonable views.[31]

■■■ Incorporating the standards set forth in *Kaiser* and the review set forth in *AT & T Universal Card Service v. Bermingham (In re Bermingham)*,[32] the relevant inquiry for this Court in approving or disapproving stipulations and consent judgments resolving nondischargeability complaints under 11 U.S.C. § 523 is:

(1) whether the Stipulations are fair and equitable considering the probability

---

**27.** 280 B.R. 520, 521 (Bankr.D.Colo.2002).

**28.** In *Valencia*, a creditor brought an adversary proceeding to except from discharge a prepetition settlement of a sexual harassment suit. The debtor/defendant filed a motion to dismiss premised on the argument that the parties, by agreement, converted what may have been a nondischargeable sexual harassment claim to a contract claim. Judge Campbell declined the debtor's motion to dismiss under this "novation" theory and found that the line of cases following *United States v. Spicer*, 57 F.3d 1152 (D.C.Cir.1995) was persuasive on this issue. Under the *Spicer* line of cases, the courts have held that, as a matter of policy, such settlements cannot be given effect so as to extinguish the alleged offensive underlying facts.

*Valencia* differs from these cases in this manner: *Valencia* involves a *prepetition settlement*. Here, the Stipulations involve prepetition unsecured debt that is resolved by Stipulations reached postpetition in an adversary proceeding. In effect, because judgments are being entered, the original prepetition unsecured debts, *necessarily* must be found to be nondischargeable so as to survive going forward. Consequently, either implicitly or expressly, the judgments to be entered as a result of these Stipulations retains the characteristics of the alleged offending conduct— that is, "false pretenses, a false representation, or actual fraud."

**29.** *Kaiser Steel Corp. v. Frates (In re Kaiser Steel Corp.)*, 105 B.R. 971, 976 (D.Colo.1989).

**30.** *In re Western Pacific Airlines, Inc.*, 219 B.R. 575, 578 (D.Colo.1998).

**31.** *In re Kaiser Steel Corp.*, 105 B.R. at 977. The District Court, in the *Western Pacific Airlines Case*, noted that the "court need not resolve all of [the four] issues, but must only identify them 'so that the reasonableness of the settlement may be evaluated.'" *In re Western Pacific Airlines, Inc.*, 219 B.R. at 579 (citations omitted).

**32.** 201 B.R. 808, 816 (Bankr.W.D.Mo.1996).

of success, for either side, in the litigation;[33]

(2) the complexity and expense of the litigation;[34]

(3) whether the debtors/defendants understand the terms of the agreement;[35]

(4) whether there is a reasonable basis for entry of the judgment on the terms agreed to by the parties;[36]

(5) whether the debtors/defendants are aware of the right to a trial on the merits;[37] and

(6) whether the debtors/defendants consent at the time judgment is rendered.[38]

1. *Are the Stipulations Fair and Equitable Considering the Probability of Success for the Plaintiffs?*

i. *The Strength of MBNA's and Discover's Complaints*

■ Each Complaint contains generalized "boiler plate" assertions that the Defendants obtained the money from the Plaintiff through fraud, false pretenses, false representations, and/or actual fraud.[39] FED.R.CIV.P. 9(b), made applicable to adversary proceedings by FED.R.BANKR.P. 7009, provides that "[i]n all averments of fraud or mistake, the circumstances consti-

tuting fraud or mistake shall be stated with particularity." Nevertheless, Rule 9(b) must be read in conjunction with Rule 8(a), (e) and (f).[40] Pleadings filed in an adversary proceeding are to contain "a short and plain statement of the claim." When alleging fraud in a complaint, it is necessary to set forth a basic outline of fraud and indicate who made the misrepresentations and the time and place the misrepresentations were made.[41] The averments shall be "simple, concise, and direct" and shall be construed so as to do "substantial justice."[42] The purpose behind Rule 9(b) is to allow the defendant fair and reasonable notice of the plaintiff's claims and the factual grounds upon which the claims are based.[43] As set forth, *supra* at II(A) and (B), the allegations are that, generally, the Defendants used the Plaintiffs' credit cards without an ability to repay, without an intent to repay, and that the debt was thus obtained by "false pretenses, a false representation, or actual fraud."[44] The Court concludes that, upon reviewing the Complaints, it is questionable that the Plaintiffs have complied with the requirements of Rules 8 and 9.

ii. *Defendants' Intent*

Analysis of whether the Stipulations are fair and equitable begins with at least a

---

33. *In re Kaiser Steel Corp.,* 105 B.R. at 977.

34. *Id.*

35. *In re Bermingham,* 201 B.R. at 817.

36. *Id.*

37. *Id.*

38. *Id.*

39. These "boiler plate" complaints from credit card lenders are commonplace and not isolated to this counsel or these creditors.

40. *Schwartz v. Celestial Seasonings, Inc.,* 124 F.3d 1246, 1252 (10th Cir.1997); *In re Volpert,* 175 B.R. 247, 258 (Bankr.N.D.Ill.1994).

41. *Koch v. Koch Indus., Inc.,* 203 F.3d 1202, 1238 (10th Cir.2000).

42. *Schwartz,* 124 F.3d at 1252.

43. *Farlow v. Peat, Marwick, Mitchell & Co.,* 956 F.2d 982, 987 (10th Cir.1992).

44. In most of these 11 U.S.C. § 523(a)(2)(A) cases, the foundation of the allegations are the defendant's schedules and statements of financial affairs. Here, the allegations are built on the Defendants' schedules and statement of financial affairs and inference, suppositions, conclusory statements and vague assertions are drawn out therefrom.

cursory consideration of how strong are MBNA's and Discover's cases and how strong are Mr. Panem's and Ms. Riley's defenses thereto. The operative section upon which the two Complaints at issue are brought is 11 U.S.C. § 523(a)(2)(A). Section 523(a)(2)(A) provides that:

A discharge under section 727 … does not discharge an individual debtor from any debt—

. . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respect the debtor's or an insider's financial condition …

 In order to prevail under section 523(a)(2)(A), MBNA and Discover must prove by a preponderance of the evidence that:

(1) the debtor made a false representation;

(2) the debtor made the representation with the intent to deceive the creditor;

(3) the creditor relied on the debtor's representation;

(4) the creditor's reliance was justifiable; and

(5) the creditor was damaged as a proximate result.[45]

The first two elements that must be demonstrated by a preponderance of the evidence—that the debtor made a false representation with the intent to deceive the creditor—relate to the "false pretenses, a false representation, or actual fraud" as set forth in 11 U.S.C. § 523(a)(2)(A).

 As this case is thus far presented to the Court, MBNA and Discovery have *not* demonstrated, nor is there now a reasonable inference, that there is the requisite "intent" under 11 U.S.C. § 523(a)(2)(A) under the "totality of the circumstances" test.[46] In so finding, the Court looks to the following nonexclusive list of factors to determine a debtor's intent under the "totality of the circumstances" test:

(1) the length of time between the charges made and the filing of the bankruptcy;

(2) whether the debtor consulted an attorney regarding bankruptcy prior to the charges being made;

(3) the number of charges made;

(4) the amount of the charges;

(5) the financial condition of the debtor at the time the charges were made;

(6) whether the charges were above the credit limit of the account;

(7) whether the debtor made multiple charges on any given day;

(8) whether or not the debtor was employed;

(9) the debtor's employment prospects;

(10) the debtor's financial sophistication;

(11) whether there was a sudden change in the debtor's buying habits; and

(12) whether the purchases were made for luxuries or necessities.[47]

From the face of the Complaint and the exhibits thereto, this Court can conclude that factors 1, 3, 4, 6, and 7 are simply *not yet* met in Mr. Panem's case. Mr. Panem

---

**45.** *Field v. Mans*, 516 U.S. 59, 70, 116 S.Ct. 437, 444, 133 L.Ed.2d 351 (1995) (citation omitted); *see also Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir.1996).

**46.** *Chevy Chase Bank FSB v. Kukuk (In re Kukuk)*, 225 B.R. 778, 786 (10th Cir. BAP 1998).

**47.** *In re Kukuk*, 225 B.R. at 786.

incurred a *one* time charge of $9,500.00 after MBNA solicited the same from him. He had a credit limit of $10,200.00 at the time the debt was incurred. Factors 2, 4, and 8–12 require further evidence before this Court.

With respect to Ms. Riley's case, this Court can conclude that factors 1, 3, 4, 6, and 7 are also *not yet* met in her case. Ms. Riley incurred a *one* time charge of $5,000.00 after Discover solicited the same from her. Factors 2, 4, and 8–12 require further evidence before this Court.

It is important, here, that both Defendants denied, without qualification, that they obtained the debt by "false pretenses," "false representations, or actual fraud." They do, however, state that the principal reason for settlement is the cost of litigation, which they cannot afford.

### iii. *Justifiable Reliance—Overview*

MBNA and Discover must also prove, at trial, "justifiable" reliance. The United States Supreme Court in *Field v. Mans*[48] addressed the concept of "justifiable" reliance in the context of 11 U.S.C. § 523(a)(2)(A) and stated:

> Then, as now, the most widely accepted distillation of the common law of torts was the Restatement (Second) of Torts (1976), published shortly before Congress passed the Act. The section on point dealing with fraudulent misrepresentation states that both actual and "justifiable" reliance are required. *Id.* § 537. The Restatement expounds upon justifiable reliance by explaining that a person is justified in relying on a representation of fact "although he might have ascertained the falsity of the representation had he made an investigation." *Id.* Significantly for our purposes, the illustration is given of a seller of land who says it is free of encumbrances;

according to the Restatement, a buyer's reliance on this factual representation is justifiable, even if he could have "walk[ed] across the street to the office of the register of deeds in the courthouse" and easily have learned of an unsatisfied mortgage. *Id.,* § 540, Illustration 1. The point is otherwise made in a later section noting that contributory negligence is no bar to recovery because fraudulent misrepresentation is an intentional tort. Here, a contrast between a justifiable and reasonable reliance is clear: "Although the plaintiff's reliance on the misrepresentation must be justifiable ... this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Id.,* § 545A, Comment b. Justifiability is not without some limits, however. As a comment to [Restatement (Second) of Torts] § 541 explains a person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses. Thus a defect that any experienced horseman

---

48. 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

would at once recognize at first glance may not be patent to a person who has had no experience with horses." *Id.,* Comment *a.* A missing eye in a "sound" horse is one thing; long teeth in a "young" one, perhaps, another.[49]

Counsel for MBNA and Discover, in the Request for Reconsideration to Amend and Clarify the Memorandum Opinion suggest that under Restatement (Second) of Torts § 540, a "credit card issuer has *no* duty to investigate" the credit-worthiness of its card holders.[50] The creditors assert that, if this Court is using a "red flag" analysis, as discussed in *In re Eashai,*[51] only information that is *actually* in the creditor's possession would negate "justifiable" reliance. In other words, only existing data in the creditor's database would negate "justifiable" reliance and any easily ascertainable credit information from an external source would not negate "justifiable" reliance.

Based on the facts of *these two cases* and based upon the information before the Court at this juncture,[52] the Court concludes, preliminarily, that the credit card issuers had at least some duty to investigate the credit-worthiness of the Defendants before proactively inviting the Defendants to utilize unsolicited convenience checks.

First, counsel for MBNA and Discover indicated at the hearing on June 1, 2006, that the creditors conducted periodic credit evaluations of their cardholders.[53] This would seem to place at least some credit and financial information in their possession at the time of the mailing of the unsolicited invitation to use convenience checks.

Second, MBNA and Discover state in their Request for Reconsideration to Amend and Clarify the Memorandum Opinion:

> In the year 2006, all commercial creditors have or can have [credit information] available to them or they can require customers to provide copies of the free credit reports they may obtain in minutes on the internet from all three major reporting services.[54]

The integration of this readily accessible current and accurate credit information into the cardholders' account data file must be further explained and examined at a trial of this matter. This analysis is consistent with Restatement (Second) of Torts § 540 and 541.

Restatement (Second) of Torts § 540 seemingly indicates that there is no duty to investigate, in that it provides:

> The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation.

---

**49.** 516 U.S. 59, 70–71, 116 S.Ct. 437, 443–44, 133 L.Ed.2d 351 (1995) (footnote omitted).

**50.** Emphasis in original.

**51.** 87 F.3d 1082, 1090–91 (9th Cir.1996).

**52.** The Court is not making a final determination with respect to justifiable reliance at this time because, among other things, the Court is not fully apprised of: (1) the information in MBNA's and Discover's possession with respect to their cardholders; (2) the integration of external credit reporting agencies into the individual cardholders' account information; and (3) the extent and timing of the periodic reviews of the cardholders' accounts.

**53.** The timing and extent of the periodic credit evaluations is unclear at this point in the case.

**54.** Request for Reconsideration to Amend and Clarity the Memorandum Opinion filed by MBNA and Discover on August 14, 2006 (Docket # 21) at 3, n. 5.

However, Restatement (Second) of Torts § 540 must be read in conjunction with Restatement (Second) of Torts § 541, which provides:

> The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him.

As discussed in comment *a* to Restatement (Second) of Torts § 541 and discussed in *Field v. Mans*,[55] blind faith in mailing the unsolicited convenience checks seems to lack good "horse sense." In other words, the process here *begins* with MBNA and Discover sending the unsolicited convenience checks, apparently without any credit inquiry. The Defendants receive the offers from MBNA and Discover and use the same. Here, it so happens, the Defendants were impecunious at the time the credit was utilized.

■ Third, it would seem that creditors are arguing that they need do *absolutely no* due diligence before sending out the unsolicited convenience checks. It would be unjust to allow a creditor to blindly request its cardholders utilize convenience checks and then allow that creditor to later claim nondischargeability on the basis of fraud under the premise that the creditor *had absolutely no duty to consider the debtors' then current financial condition before making the offer.*[56]

MBNA and Discover acknowledge that,

> **[w]ithout independent investigation almost no creditor could justifiably rely on the debtor's representations.**[57]

The Court concludes that this statement is correct—that "justifiable" reliance may not be available to many creditors in today's current commercial environment.[58] As the Supreme Court recognized in *Field v. Mans:*

> As for the reasonableness of reliance, our reading of the Act does not leave reasonableness irrelevant, for the greater the distance between the reliance claimed and the limits of the reasonable, the greater the doubt about reliance in fact. *Naifs may recover, at common law and in bankruptcy, but lots of creditors are not all naive. The subjectiveness of justifiability cuts both ways, and reasonableness goes to the probability of actual reliance.*[59]

### iv. "Justifiable" Reliance as Applied to These Cases

Mr. Panem, at the time he filed his bankruptcy petition had a total of

---

**55.** 516 U.S. 59, 70, 116 S.Ct. 437, 444, 133 L.Ed.2d 351 *See* discussion *supra.*

**56.** Perhaps analogous to this observation is the commentary made by the Ninth Circuit in *In re Eashai*, 87 F.3d 1082, 1091 (9th Cir. 1996):

> If the creditor had warning that the debtor's account was in danger of default, the creditor will not be able to establish justifiable reliance. We will not allow a creditor, who has been put on notice of the debtor's intent not to repay, to extend credit and then later claim nondischargeability on the basis of fraud.

**57.** Request for Reconsideration to Amend and Clarity the Memorandum Opinion filed by MBNA and Discover on August 14, 2006 (Docket # 21) at 3, n. 5 (emphasis added).

**58.** In the Request for Reconsideration, MBNA and Discover request clarification as to whether this Court's ruling only pertains to credit card issuers. This Court concludes that the ruling is dependent on the facts of the case and may pertain to *any* creditor.

**59.** 516 U.S. at 76, 116 S.Ct. at 446 (emphasis added). In these cases, both MBNA and Discover are large, sophisticated, market savvy, and very knowledgeable financial credit card institutions. Thus, the subjectiveness of reasonableness or justifiability *may* cut against them. Conceivably, because of MBNA's and Discover's savvy and sophisticated use of accurate and current credit records, there may come a point where neither creditor can claim justifiable reliance.

$87,050.00 of scheduled unsecured debt. In the three years prior to his bankruptcy filing, he had average yearly income of about $18,094.75 per year. It seems inconceivable that the periodic credit reviews evidently conducted by MBNA would not have picked up on Mr. Panem's inability to repay even the minimum monthly payment. Yet, it seems undisputed that the $9,500.00 offer of credit to Mr. Panem was solicited by MBNA.

Ms. Riley, on the other hand, had a total of $64,000.00 in scheduled unsecured debt. In the three years prior to her bankruptcy filing, she had average yearly income of $26,000.00 per year. Again, it is a mystery why Discover would have sent an unsolicited offer to incur new, additional debt to Ms. Riley considering her financial condition that would have been—and easily could have been—picked up on a credit report.

Nevertheless, the Court is not making a final determination on the justifiability of reliance. However, this Court cannot now conclude that there is justifiable—or any— reliance on the part of MBNA or Discover at this stage of the proceeding.[60]

### 2. *The Complexity and Expense of the Litigation*

As expressed by both Mr. Panem and Ms. Riley, the key factor for entering into the Stipulations was the expense and time associated with litigating this matter. The concern, here, as in many of the com-

plaints filed seeking a determination that credit card debt is not dischargeable under 11 U.S.C. § 523(a)(2)(A), is that many debtors are *pro se* (as is Ms. Riley), impecunious, uneducated in bankruptcy law, and unable to effectively defend themselves. Moreover, they want to get on with their lives and their "fresh start." Thus, many debtors/defendants unwittingly and unknowingly enter into settlements in cases that may not have merit. As counsel for Mr. Panem noted, it would cost Mr. Panem substantial legal fees to defend this matter and, moreover, he might conceivably lose. Thus, counsel for Mr. Panem encouraged his client to settle.

Although 11 U.S.C. § 523(d) was designed to provide a safeguard for debtors wrongfully sued under 11 U.S.C. § 523(a)(2), it has become largely ineffective because: (1) debtors still have to face expensive and difficult litigation and the attendant personal, emotional, family, and financial costs related thereto, (2) they have to win the litigation, and (3) after winning, they must seek a court's determination that the position of the creditor was not substantially justified.[61] Debtors sometimes might settle because they simply do not want to live with the inevitable costs and personal turmoil created by these lawsuits.

Additionally, from the standpoint of the expense and complexity of the litigation, an inequity also exists between these Plaintiffs and the Defendants. The litigation expenses incurred by MBNA and Dis-

**60.** The Court cannot reach a conclusion with respect to the final factor: whether MBNA and Discover sustained damage. The Court cannot ascertain a sustained damage because it cannot, at this time, conclude that there was any false representation made by Mr. Panem and Ms. Riley with the intent to deceive MBNA and Discover upon which they relied.

**61.** 11 U.S.C. § 523(d) provides:

If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

cover, if these case were to go forward, compared to their overall financial picture would, most likely, be a "drop in the bucket." Moreover, they are able to afford competent counsel and, this Court can surmise, they can pay competent counsel. Unfortunately, the same may not be said for Mr. Panem or Ms. Riley. To proceed in litigation would make a substantial dent in their budget. Additionally, there is very little assurance that Mr. Panem or Ms. Riley can pay counsel, even if counsel were to assist them in the litigation.[62]

Additionally, a debtor is not likely to have much, if any, experience in dealing with the unique and arcane features of bankruptcy law. Even if assisted by competent counsel, as Mr. Panem is, the litigation experience for a debtor is still, basically, costly, complex, difficult, and emotionally draining. On the other hand, MBNA and Discover, because bankruptcy is a reality of their businesses, are more attuned and comfortable to the worlds of bankruptcy and litigation.

The complexity and expense analysis is a bit of a quandary for the Court; that is, does the Court approve the Stipulations realizing that going forward in the litigation can be quite expensive, personally demanding, inconvenient and problematic for the Defendants? Or, does this Court approve the Stipulations despite the stacking of the legal and financial cards in favor of MBNA and Discover? The Court believes it cannot approve the Stipulations because of this dilemma and because it does not have sufficient information before it so as to determine that the Stipulations are fair and equitable.

### 3. Do the Defendants Understand the Terms of the Agreement?

During the hearing on June 1, 2006, this Court inquired as to Mr. Panem's and Ms. Riley's understanding of the Stipulations and the orders to be entered as a result thereof. Neither Mr. Panem nor Ms. Riley fully understood that they were consenting to a judgment based on fraud wherein the debt would be nondischargeable. Both Mr. Panem and Ms. Riley vehemently denied that the debt alleged in the complaint was procured by "false pretenses, a false representation, or actual fraud." Both Mr. Panem and Ms. Riley indicated significant misunderstanding or confusion as to exactly what they were agreeing to by the Stipulations. Moreover, both Mr. Panem and Ms. Riley stated that the primary reason they settled is that they could not afford to defend the Complaint. Based upon these statements made by Mr. Panem and Ms. Riley, it would be an injustice to approve the Motions for Approval of Stipulations because they do not understand the agreements and they deny the allegations in the original Complaints.[63]

### 4. Is There a Reasonable Basis for Entry of the Judgment on the Terms Agreed to by the Parties?

As stated in the section above, it is clear that the parties do not fully understand

---

**62.** The Court does recognize that there is a vital and vigorous program in this District that *permits defendant-debtors to acquire* counsel via the Faculty of Federal Advocates Bankruptcy *Pro Bono* Program without a fee. This program provides representation to impecunious debtors who qualify for participation in that program. Here, this Court is advised that Ms. Riley was advised of the program and informed the Court that she was not eligible for the program.

**63.** *AT & T Universal Card Service v. Bermingham (In re Bermingham)*, 201 B.R. 808, 817 (Bankr.W.D.Mo.1996). In *Bermingham*, the Court stated that it would be an abuse of the court's discretion to approve an agreement when confronted with a clear and certain expression of a party's lack of understanding as to what was intended by the agreement.

the implications, inferences, and consequences flowing from the Stipulations. Thus, there can be no reasonable basis for entry of the judgment on the terms agreed to by the parties until and unless there is that requisite understanding.

### 5. *Are the Defendants Aware of the Right to a Trial on the Merits?*

Mr. Panem and Ms. Riley seemed to understand that a trial on the merits was available. However, both stated that a trial on the merits would be too expensive—monetarily and personally—and thus they chose to enter into the Stipulations.

### 6. *Do the Defendants Consent at the Time Judgment is Rendered?*

The Court set this matter on June 1, 2006 so as to make a determination of the Defendants' consent contemporaneous with the entry of any order and judgment. The Defendants not only indicated that they did not fully understand the implications of the Stipulations, but upon further inquiry by the Court equivocated with respect to their consent. Thus, this Court cannot conclude that the Defendants knowingly consent to the Stipulation at the time the judgment is to enter.

## V. *Order*

Based upon the above and foregoing,

IT IS ORDERED that:

1. The Riley Motion for Approval of Stipulation (Docket # 8) is DENIED, without prejudice. This Stipulation has been withdrawn and the parties have now moved to dismiss this adversary proceeding by way of a Motion filed on June 27, 2006 (Docket # 17). By this Order, this Court APPROVES the Motion for Dismissal of the Adversary Proceeding and the Riley adversary proceeding is hereby DISMISSED. The Clerk of the Court may close the Riley adversary proceeding

10 days after this Order becomes final and non-appealable.

2. The Panem Motion for Approval of Stipulation (Docket # 5) and Panem's Renewed Motion for Approval of Stipulation (Docket # 11) are DENIED, without prejudice.