In re Terry Karl SANDMAN, Donna May Sandman, Debtors.

UNITED STATES of America, Acting By and Through the COMMODITY CREDIT CORPORATION USDA, Plaintiff,

v.

Terry Karl SANDMAN and Donna May Sandman, Defendants.

Bankruptcy No. 485–00145.
Adv. No. 485/0038.

United States Bankruptcy Court, D. Montana.

Jan. 7, 1987.

Frank Meglen, Billings, Mont., for plaintiff.

Steven Mackey, Billings, Mont., for debtors.

ORDER

JOHN L. PETERSON, Bankruptcy Judge.

The issue presented in this adversary proceeding is whether the Debtors/Defendants obligation to the Plaintiff Commodity Credit Corporation (hereinafter "CCC") is

subject to the Order of Discharge, or whether such debt is treated as an exception to discharge under Sections 523(a)(2)(B) and/or 523(a)(6) of the Bankruptcy Code. After trial of this matter the Court finds as follows:

*Findings of Fact*

On or about October 13, 1982, the Defendants applied for and received a price support loan, documented as Loan No. 6, from Plaintiff, in the amount of $69,120.00. Pledged as security for the loan was the Debtors' 1982 barley crop. The security agreement established Defendants' quantity of barley pledged at approximately 40,000 bushels, stored in a quonset hut on the "Damschen property", being leased by the Defendants at the time. The quantity of barley to be stored and pledged as security governs directly the amount of money which would be loaned. The Plaintiff properly perfected its security interest in the barley crop as its collateral for the loan.

The loan matured July 31, 1983. Defendants failed to meet the terms. Upon investigation undertaken by the Plaintiff, they discovered that all the barley from the Damschen quonset hut, totaling approximately 21,000 bushels as opposed to 40,000 bushels, had been loaded into trucks and hauled to T–Bone Feeders in Shepherd, Montana, where it was sold for $59,800.00. When confronted with this information, Defendant admitted the sale, confessed knowledge of CCC's security interest at the time of sale and tendered a check to Plaintiff on December 15, 1983, for $55,979.25 as partial payment on the note. The check was dishonored due to insufficient funds.

The quonset hut on the Damschen property in which the barley was stored was Sandman's first experience with this type of structure. He had previously stored his barley in round silos. Sandman relied on the statement of Robert Damschen that the capacity of the quonset hut was 44,000 bushels. Indeed, when Sandman applied for the loan, Plaintiff's review of their own records indicated Damschen had previously been granted a loan based on a 40,000

bushel security interest. The terms of the agreement allowed CCC the right to enter the premises to inspect the collateral. CCC never enforced this right, although Sandman never requested CCC to verify his statement of the amount of grain in storage.

The barley placed in the quonset hut was grown on approximately 600 acres of cropland with an average yield of 80 bushels per acre or an average production of 48,000 bushels. The property was subject to a share crop arrangement with Sandman retaining two-thirds of the crop. Sandman's share was loaded into the quonset through the top. Sandman's theory, which seems entirely credible, is that as the barley was loaded into the hut, the base of the hut filled, but as the load got closer to the top, the stack became concealed and pyramid shaped and the walls of the hut did not fill. Thus, when the hut looked full and no more barley would fit through the top, the hut actually had the potential for more storage. In fact, excess barley remained after the hut was "filled", some of which was used as feed and the remainder stored elsewhere. Sandman was not present when the hut was filled.

Sale of the barley to T–Bone Feeders resulted in net proceeds to Sandman of approximately $48,000.00. Sandman used all of these funds to pay operating expenses. Sandman admits that the sale of the barley to T–Bone Feeders was in violation of the terms of the agreement with CCC, but contends he anticipated replacing the barley with the following year's crop. However, drought intervened and the crop never materialized. While the Debtor claims the tender of the $55,979.85 check to CCC was after consultation by him with his bank, the fact is there were insufficient funds in the account to honor the check. No further collection efforts were successful.

CCC places the amount due as of July 31, 1985 at $62,095.71 principal with interest of $7,251.75 for a total obligation of $69,347.46. They maintain this debt is non-dischargeable under either Section 523(a)(2)(B)

or 523(a)(6) of the Bankruptcy Code. CCC further maintains if they had been aware that Sandman only had 21,000 (sic) bushels of barley, the maximum loan available to him would have been $39,744, thus Sandman's misstatement of barley induced Plaintiff to enter a loan for $29,376.00 more than Sandman was entitled to under CCC regulations. The parties stipulated at trial to dismissal of Donna Sandman as party defendant to this action.

*Applicable Law*

 Section 523 of the Bankruptcy Code provides, in pertinent part:

Exceptions to discharge.

(a) A discharge under Section 727, 1141, or 1328(h) of this title does not discharge an individual debor from any debt—

\* \* \* \* \* \*

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by

\* \* \* \* \* \*

(B) use of statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; or

\* \* \* \* \* \*

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

\* \* \* \* \* \*

The creditor has the burden of proof to sustain such objections and it must prove its case by clear and convincing evidence, i.e., by a standard greater than preponderance of the evidence. *In Re Eberle*, 61 B.R. 638, 644 (Bankr.Minne.1985); *In Re Tashman*, 21 B.R. 738 (Bankr.Vt.1982); *In Re Huff*, 1 B.R. 354, 357 (Bankr.Utah 1979). *In Re Deneberg*, 37 B.R. 267, 271

(Bankr.Mass.1983) explains that a materially false statement is one "which paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." There must also be "reasonable" reliance on the false written statement. *In Re Harms*, 53 B.R. 134, 140–41 (Bankr.Minne.1985). There can be no reasonable reliance when the creditor knows the information is not accurate, *Swift v. Robins Federal Credit Union*, 415 F.2d 179, 184 (5th Cir.1969); *In Re Houk*, 17 B.R. 192, 195–96 (Bankr.S.D. 1982), where the financial statement does not contain sufficient information to portray a realistic financial status, *In Re Magnusson*, 14 B.R. 662, 668–69, Ft. 1 (Bankr. E.D.N.Y.1981); *In Re Andrews*, 33 B.R. 970 (Bankr.Mass.1981), when the creditor's investigation reveals the statement is false or incomplete, *In Re Smith*, 2 B.R. 276, 279 (Bankr.E.D.Va.1980), and, an emerging view, where the creditor failed to verify any of the information contained in the statement, *In Re Breen*, 13 B.R. 965 (Bankr.S.D.Ohio 1981); *In Re Eberle*, supra, at 648; *In Re Salzman*, 61 B.R. 878, 887 (Bankr.S.D.N.Y.1986). See contra: *In Re Guistolisi*, 61 B.R. 821, 824 (Bankr.S.D. Fla.1986) (neither the statute nor anything in the legislative history indicates that a lender is under a burden to verify a borrower's personal financial statement). Once the creditor establishes a prima facie case of misrepresentation, the burden of going forward with the evidence, particularly on the fifth element of intent to deceive, shifts to the Debtor. *In Re Taylor*, 514 F.2d 1370, 1373 (9th Cir.1975); *In Re Matera*, 592 F.2d 378, 380–81 (7th Cir. 1979). *Taylor*, supra, has held that specific intent to defraud must be proven, and further held that since bankruptcy is intended to give a debtor a fresh start, exceptions to discharge must be strictly construed against the objecting creditor and liberally in favor of the debtor, id. at 1373. Specific intent, however, may be inferred from the false financial statement and other surrounding circumstances, since it relates to a subjective state of mind of the debtor.

*In Re McGrath,* 7 B.R. 496, 498 (S.D.N.Y. 1980), *In Re Graham,* 11 B.R. 701 (Bankr. Conn.1981); *In Re Drewett,* 13 B.R. 877 (Bankr.E.D.Pa.1981).

▪ With the above principles in mind, I find and conclude CCC has failed to prove by clear and convincing evidence that the financial statement setting forth Sandman's barley interest at 40,000 bushels was made with the intent to deceive the Plaintiff. The facts show that, at best, Sandman was negligent in statement as to the amount of barley in the quonset. The facts which I find support this conclusion are: Sandman's first use of this storage facility; the actual capacity of the quonset as relayed to Sandman by the Seller of that facility and documented in the Plaintiff's own files; the logical explanation for the belief that the quonset was loaded with grain; and the ability of CCC to verify the quantity in storage if they so desired which establishes a mistaken belief on the part of both parties as to the actual grain in storage. Accordingly, the Plaintiff's claim for relief under Section 523(a)(2)(B) must fail.

▪ The second ground on which the Plaintiff claims relief is Subsection (a)(6) of the statute, in that the Defendant's sale of the barley without notice or consent of the Plaintiff constituted conversion of the Plaintiff's property, and was thus willful and malicious to the Plaintiff.

There seems to be no issue that Sandman's act of selling the barley constituted conversion. Sandman admits to knowledge of the security agreement at the time of the sale and that he failed to remit the funds to the secured party. Thus the issue centers around whether the conversion constituted willful and malicious injury.

The recent case of *In Re Cecchini,* 772 F.2d 1493 (9th Cir.1985), is the leading case in this circuit regarding statutory interpretation of Subsection 523(a)(6). The Court of Appeals, after reviewing the relevant authorities and reasons behind the statute, adopted the following definition of the terms "willful and malicious" set forth in 11 U.S.C. § 523(a)(6), to-wit:

"[W]hen a wrong act such as conversion, done intentionally, necessarily produces harm and is without just cause or excuse, it is 'willful and malicious' even absent proof of a specific intent to injure ..."

Ibid at 1496.

By application of the willful and malicious standard to the relevant facts, I find the Plaintiff has sustained its burden by clear and convincing evidence. Sandman, aware of the consequences of his act, converted the property of another, from which CCC suffered a substantial loss. Sandman's explanation that he intended to cover the loss from sale proceeds of next year's crop, clearly shows he knew he owed the sales proceeds to CCC, yet converted them to his own use. Even though the proceeds from the sale were used to pay the operating expenses of the ranch, such fails to satisfy just cause for the deliberate unilateral action of the Debtor taken without knowledge or consent of the secured creditor. CCC suffered a substantial loss as a direct result of the wrongful, intentional conduct of the Debtor.

The final issue deals with damages. CCC maintains the balance due under the note, principal and interest, stands at $69,-347.46. The sale of the barley by Sandman resulted in proceeds of $48,000.00 and this was the collateral of CCC converted by Sandman for his own use without consent of the secured creditor. Since the Plaintiff has prevailed in this action under Subsection (a)(6) of Section 523, i.e., conversion theory, the amount of damages is the amount of money received by the Defendant and not remitted to the Plaintiff, namely $48,000.00.

IT IS ORDERED:

(1) That Defendant Donna May Sandman is dismissed from this proceeding;

(2) That judgment be entered in favor of the Plaintiff in the amount of $48,000.00 and said sum is non-dischargeable under 11 U.S.C. § 523(a)(6).

The Clerk shall enter judgment accordingly.

This opinion constitutes Findings of Fact and Conclusions of Law, pursuant to Rule 7052, Rules of Bankruptcy Procedure.