In re Heather R. CACCIATORI, Debtor.

First Mutual Sales Finance, Plaintiff,

v.

Heather R. Cacciatori, Defendant–Debtor.

Bankruptcy No. 6:10–bk–36672–MW. Adversary No. 6:10–ap–01699–MW.

United States Bankruptcy Court, C.D. California, Riverside Division.

Feb. 15, 2012.

Kenrick Young, Esq., for First Mutual Sales Finance.

Heather R. Cacciatori, pro se.

## MEMORANDUM DECISION

WALLACE, Bankruptcy Judge.

This adversary proceeding came on for trial on January 23, 2012, to determine the dischargeability of a debt owed to plaintiff First Mutual Sales Finance, a Delaware corporation ("First Mutual") by defendant-debtor Heather R. Cacciatori ("Ms. Cacciatori").

The Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334 and the General Order, filed July 23, 1984, of the United States District Court for the Central District of California. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## FINDINGS OF FACT

Ms. Cacciatori met at her residence in Riverside, California with a sales representative for Clearview Home Improvements ("Clearview") on June 8, 2007 to arrange for the purchase and installation of replacement windows. The sales representative informed Ms. Cacciatori that the sale could be financed, subject to credit approval. The sales representative produced a credit application form from Viewtech Financial Services, Inc. and began filling it out in response to information supplied by Ms. Cacciatori. When the application was completed, he gave it to Ms. Cacciatori who, after reviewing it, signed and dated it.[1]

At the time of these events Ms. Cacciatori was a self-employed website designer (and had been since 2001). The credit

---

1. Reporter's Transcript of Proceedings ("R.T.") at 31 (line 2), 52, 54–55, 57, 66, 73.

application form had three boxes to check—Full Time Employee, Part Time Employee and Self–Employed—and the sales representative checked "Self–Employed." Another space on the credit application called for "Applicant's Gross Salary* " along with blanks to check for Monthly, Hourly, Weekly and Annually. The asterisk text for the word "Salary* " stated that "Alimony, child support or separate maintenance income need not be revealed if you do not have it considered as a basis for repaying the obligation."[2] The term "salary" would not ordinarily be viewed as including within its ambit income from alimony or child support.[3] The asterisk text creates the implication that alimony, child support or separate maintenance should be included under "Applicant's Gross Salary* "—even though such items are not salary—if the applicant wants them considered as a basis for repaying the obligation.

Ms. Cacciatori told the sales representative that her *projected* weekly income for the year was $900. At that time Ms. Cacciatori was regularly depositing $900 per week in her bank account. The sales representative told Ms. Cacciatori that she could get a lower rate of interest on the loan if she were able to state more income on the credit application. Ms. Cacciatori responded that her partner, Tania Wilson,[4] who lived in the same household, was contributing $2,200 per month to the household's operation. The sales representative then filled in the "Applicant's Gross Salary* " blank with "$5500.00" and checked the box indicating this was a Monthly rate. Ms. Cacciatori understood the "$5500.00" to be the sum of her monthly income of $3,300 and her partner's monthly contribution of $2,200.[5] Ms. Cacciatori believed this was a true and correct response in the "Applicant's Gross Salary* " blank at the time she signed the credit application form.

Immediately below the box on the credit application form for "Applicant's Gross Salary* " is a box for "Other Sources of Income." This box does not specify whether such income is the applicant's income or income of another person. Nor does the box or any other text on the application form indicate the relationship between "Applicant's Gross Salary* " and "Other Sources of Income" or address the potential problem of a double counting of income.[6] The sales representative entered "$2200.00" in this box and, in the line next to it, wrote "Partner Income."[7] Ms. Cacciatori believed this was a true and correct entry in the "Other Sources of Income" blank at the time she signed the credit application form.

Below these lines on the credit application was a section for "Co–Applicant Information." The sales representative did not fill out any of the information requested by

**2.** Exhibit A (credit application); R.T. at 37.

**3.** R.T. at 39.

**4.** Ms. Wilson was Ms. Cacciatori's partner in 2007 but is no longer her partner. R.T. at 50, 73.

**5.** R.T. at 66.

**6.** Mr. Michael Sanford, an officer of First Mutual, testified that the purpose of the asterisk text was to inform persons filling out the loan application form "if you want other income to be considered, it should be put in the space where it says other sources of income." R.T. at 38–39. This explanation makes little sense. If such was First Mutual's intention, it is manifest that the asterisk should have been placed next to "Other Sources of Income," not next to "Applicant's Gross Salary*." Mr. Sanford's testimony leads the Court to wonder whether the placement of the asterisk and the asterisk text was a typographical error on the loan application form.

**7.** R.T. at 55–56.

the form with respect to a "Co–Applicant," such information being the co-applicant's name, mailing address, social security number, job position or title and, importantly, "Co–Applicant's Gross Salary\*."

Ms. Cacciatori reviewed the form after it was filled out by the sales representative. She did not find it unusual that the "Co–Applicant Information" section of the credit application was not filled out because she did not intend that Ms. Tania Wilson be a loan applicant.[8] Ms. Tania Wilson did not sign the credit application. Ms. Cacciatori believed it was true, accurate and proper to leave the "Co–Applicant Information" section blank at the time she signed the credit application form.

Ms. Cacciatori offered to substantiate and corroborate the financial information on the credit application by providing the sales representative access to her bank statements, books of account and 2006 tax returns. The sales representative declined the opportunity to inspect these documents.[9]

The filled out and signed credit application was faxed on June 11, 2007 and then faxed again on June 14, 2007, presumably to some person who had the authority to grant or deny credit.[10] The decision was to grant credit, and, on June 18, 2007, Ms. Cacciatori signed a Retail Installment Contract promising to pay Clearview 144 consecutive monthly payments of principal and interest, each in the amount of $190.79. The original principal amount of the loan was $13,886 and the annual percentage rate was 12.99 percent. An en-dorsement indicates that on June 14, 2007 Clearview assigned the contract to Vision Financial Inc., who in turn assigned it on June 21, 2007 to First Mutual Bank (a predecessor in interest of First Mutual).

First Mutual and its predecessor in interest First Mutual Bank are in the business of originating consumer sales finance loans for home improvements. First Mutual relies heavily on the accuracy of written financial statements (which would appear to include credit applications stating financial information about the loan applicant) from the consumer in deciding whether to extend credit. In this case, First Mutual (or its predecessor) used a proprietary formula based upon income represented in writing by the consumer, the consumer's credit score, the consumer's debt-to-income ratio and residual gross income. In reviewing Ms. Cacciatori's credit application, First Mutual came to the conclusion that Ms. Cacciatori had a gross monthly income of $5,500.00.[11]

Ms. Cacciatori's website design business went into a severe downturn in the latter months of 2007 when parties who were doing business with her cancelled their contracts. As a result, the gross receipts reported on Schedule C of her federal income tax return dropped from $46,800 in 2006 (an average rate of $900 per week) to $37,913 in 2007 (an average rate of $729 per week).[12] Other income-type metrics on her tax returns declined more sharply. Adjusted gross income fell from $11,657 in 2006 to $43 in 2007. Taxable income remained at zero in both tax years because

---

**8.** R.T. at 51, 53.

**9.** R.T. at 66–68. Mr. Sanford explained that First Mutual's loan program was a stated income program pursuant to which no verification documentation was requested or required. R.T. at 35–36.

**10.** Exhibit A.

**11.** R.T. at 17, 27–30 (". . . the $5,500 per month that she represented . . .").

**12.** Trial Exhibit 3 (2006 U.S. Individual Income Tax Return) at Schedule C, line 7; Trial Exhibit E (2007 U.S. Individual Income Tax Return) at Schedule C, line 7.

of the effect of the personal exemption and substantial itemized deductions.

Despite these financial reversals Ms. Cacciatori continued to make loan payments until August 2009. She filed a chapter 7 petition on August 20, 2010. First Mutual commenced this adversary proceeding by filing a complaint on November 29, 2010 seeking a determination that the debt owed to it by Ms. Cacciatori is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B).

## CONCLUSIONS OF LAW

■ 11 U.S.C. § 523(a)(2)(B) provides in relevant part that a discharge under 11 U.S.C. § 727 does not discharge an individual debtor from any debt for money obtained by use of a statement in writing (i) that is materially false, (ii) respecting the debtor's financial condition, (iii) on which the creditor to whom the debtor is liable for such money or credit reasonably relied, and (iv) that the debtor caused to be made or published with intent to deceive. The Ninth Circuit has reworded these requirements as follows: (1) a representation of fact by the debtor, (2) that was material, (3) that the debtor knew at the time to be false, (4) that the debtor made with the intention of deceiving the creditor, (5) upon which the creditor relied, (6) that the creditor's reliance was reasonable, and (7) that damage proximately resulted from the representation. *Candland v. Ins. Co. of N. Am. (In re Candland)*, 90 F.3d 1466, 1469 (9th Cir.1996).

■ First Mutual has the burden of proving by a preponderance of the evidence the foregoing elements of its cause of action. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991);

*Candland*, 90 F.3d at 1469. First Mutual has proven by a preponderance of the evidence items (1), (2), (5) and (7). Ms. Cacciatori represented a number of facts on the credit application, most importantly her "Applicant's Gross Salary*" and "Other Sources of Income." These facts were material in light of the nature and purposes of a credit application. The testimony of Mr. Michael Sanford, an officer of First Mutual, makes it clear that First Mutual relied on these facts in making the decision to extend credit or purchase by assignment a retail installment sales contract. First Mutual's damages proximately resulted from the representations on the credit application in the sense that the representations induced First Mutual to purchase or make the loan, and the resulting nonpayment of the loan caused damage to First Mutual.

Nevertheless, First Mutual's case has failed to prove items (3), (4) and (6) by a preponderance of the evidence and thus its cause of action cannot be sustained. Below, the Court discusses each of these items in turn.

### A. "... That the Debtor Knew At the Time to Be False ..."

■ This element looks to a defendant-debtor's contemporaneous knowledge of the falsity of representations made in connection with a lending transaction. *Gertsch v. Johnson & Johnson (In re Gertsch)*, 237 B.R. 160, 167–68 (9th Cir. BAP 1999) (citing *Candland*). Knowledge is justified true belief.[13] In order to "know" something, it is commonly accepted that three conditions must be satisfied: (1) the person must believe it to be true, (2) the person must have justifying reasons

---

**13.** This definition has come down through the centuries. Plato, *Theaetetus* 187a–201c; G. Dawson, *Justified True Belief Is Knowledge*, 31 The Philosophical Quarterly 125, 315–29 (October 1981); Matthias Stetup, The Analysis of Knowledge, *The Stanford Encyclopedia of Philosophy* (Edward N. Zalta ed., Fall 2008) ("knowledge is justified true belief").

for believing it to be true, and (3) it must in fact be true. Therefore, Ms. Cacciatori would have known the representations on the credit application to be false if (1) Ms. Cacciatori believed them to be false, (2) she had justifying reasons for believing them to be false, and (3) the representations were in fact false.

■ The Court has found as a fact, based upon Ms. Cacciatori's testimony and demeanor as a witness, that she believed to be true the representations made on the credit application regarding "Applicant's Gross Salary* ", "Other Sources of Income" and all other material facts set forth on the credit application. Additionally, based upon the loan application form's vague and confusing nature and as discussed below, it cannot be concluded that those representations were in fact false. Because Ms. Cacciatori did not believe the representations given to be false and because these representations were not in fact false (taking into account the form's vague and confusing nature), it is clear she did not "know" the representations were false.

■ However, this does not end the matter. Courts have held that a reckless disregard for the truth will satisfy this part of the *Candland* seven-part test. *Gertsch,* 237 B.R. at 167–68; The *Callaway Bank v. Asbury (In re Asbury),* 441 B.R. 629, 634 (Bankr.W.D.Mo.2010); *Avco Fin. Servs. of Billings v. Kidd (In re Kidd),* 219 B.R. 278, 282 (Bankr.D.Mont. 1998); *Beneficial Cal., Inc. v. Brown (In*

*re Brown),* 217 B.R. 857, 863 (Bankr. S.D.Cal.1998). Consequently, the Court now turns to the issues of whether the material facts represented by Ms. Cacciatori on the credit application were true or false and, if they were false, whether Ms. Cacciatori was reckless in believing them to be true.

The sales representative who filled out the credit application in this case was not called by First Mutual as a witness. Neither First Mutual nor Ms. Cacciatori could supply his name to the Court. About all that is known about this individual is that he is a male.[14]

■ The credit application filled out by the sales representative is a confusing, vague and at certain points self-contradicting document. It calls for the loan applicant to state the "Applicant's Gross Salary*," a term that is nowhere defined in the credit application and that is subject to considerable uncertainty.[15] Of special note is that the asterisk text appears to include alimony, child support and separate maintenance within the definition of "Applicant's Gross Salary* " even though neither alimony, child support nor separate maintenance is within the definition of the word "salary".[16] Having included as "salary" items that are not "salary," one is left to wonder what other items not within the definition of the word "salary" are or should be included when stating "Applicant's Gross Salary* " so as to remain truthful and not render the application misleading.

14. R.T. at 52.

15. As but one example, how should an employee who participates in a so-called "cafeteria plan" or a 401(k) plan treat the would-be salary that is withheld from the employee's paycheck and deposited into the plan? Technically, it is not part of the employee's salary because the employee has validly elected to reduce his salary by the amount of the plan

contribution. However, a broad interpretation of the word "Gross" might lead a loan applicant to include the withheld amount in stating the "Applicant's Gross Salary*."

16. *Webster's Third New International Dictionary* defines "salary" as "fixed compensation paid regularly (as by the year, quarter, month or week) for services."

As mentioned earlier, the sales representative who filled out the application chose to include the income of Ms. Cacciatori's partner.[17] Without deciding whether such inclusion is untruthful, it was not reckless for Ms. Cacciatori to believe that this inclusion was proper, given the asterisk text's inclusion of alimony, child support and separate maintenance within the definition of "Applicant's Gross Salary*." Like alimony, child support and separate maintenance, the income of Ms. Cacciatori's partner was income available to pay household expenses and, in that limited sense, not much different from alimony, child support or separate maintenance.

Moreover, it was not Ms. Cacciatori who proposed the use of this particular form of credit application; it was the sales representative. Under these circumstances it would not have been reckless for Ms. Cacciatori to believe that the sales representative knew more than she did about the form and how it should be prepared—and, importantly, how to deal with the form's inherent vagueness and self-contradictory references. Therefore, after having truthfully informed the sales representative that she was projecting 2007 income at $900 per week and that her partner was contributing $2,200 per month, it was not reckless for her to have believed—as she testified that she did believe—that $5,500 was a true and correct entry in the blank calling for "Applicant's Gross Salary*."

■ First Mutual also argues that Ms. Cacciatori's salary was not $3,300 per month during 2007 but a much lower number. Mr. Michael Sanford, an officer of First Mutual, testified that he believed that in the case of a self-employed individual the number listed for "Applicant's Gross Salary* " should have been such in-

dividual's adjusted gross income for federal income tax purposes ("AG I")[18]. Under this analysis, the $3,300 component of the $5,500 "Applicant's Gross Salary* " is untruthful because Ms. Cacciatori's AGI for 2006 was only $11,657 and for 2007 was only $43.

Once again, however, the self-contradictory nature of the credit application becomes apparent. The application clearly contemplates the use of the form by a self-employed individual because it contains a box to be checked as self-employed, full-time employee or part-time employee. A self-employed individual, though, does not have a salary. A self-employed individual has income from a sole proprietorship. Such income comes in different forms with different meanings. A self-employed person may have gross receipts or gross income, AGI, taxable income or, in an accounting rather than tax sense, gross revenues, earnings before income, taxes, depreciation and amortization ("EBITDA"), earnings before income and taxes ("EBIT"), and other income metrics. Which of these metrics is the self-employed loan applicant supposed to use in the blank for "Applicant's Gross Income* "? Not a single one of these items is salary, but choose one anyway and put in the blank. According to Mr. Sanford, Ms. Cacciatori should have chosen AGI among all these many income metrics as the correct metric to use to fill in the blank. However, when Ms. Cacciatori signed the filled-in credit application in June 2007 she could not have been expected to divine that the lender wanted AGI to be used, especially when AGI is nowhere mentioned on the application form and the sales representative who filled out the

---

**17.** *See* n.7 and accompanying text.

**18.** R.T. at 18.

form did not tell her to use AGI.[19]

As mentioned earlier, Ms. Cacciatori was putting approximately $900 in the bank each week at the time the credit application was prepared. These funds were in the nature of gross receipts—they were what her customers were paying her. She then used these funds to pay both business and household expenses. Because of the application form's failure to specify the particular income metric a self-employed individual was supposed to use in filling in the blank for "Applicant's Gross Salary* " and because $3,300 was in fact the true amount of the gross income from her business at the time the credit application was prepared, it was not reckless for Ms. Cacciatori to include in this category the amount of $3,300.

■ Finally, First Mutual argues that the credit application is untruthful because there was a double counting of Ms. Wilson's income, first under "Applicant's Gross Salary* " and then under "Other Sources of Income." However, the application form contains no statement instructing the person who prepares the form that "Other Sources of Income" is intended to be exclusive of income listed or included under "Applicant's Gross Salary." Because, as explained earlier, the category "Applicant's Gross Salary* " includes items that are not "salary" (namely, "alimony, child support and separate maintenance") it would not have been reckless for a person preparing the form to believe that "Other Sources of Income" was supposed to state non-salary items that were included in "Applicant's Gross Salary*." The sales representative filling out the form apparently interpreted "Other Sources of Income" in this fashion.[20] Ms. Cacciatori

testified that she believed this was the proper space on the application form to list her partner's income so that the lender would be aware that not all of the $5,500 listed in "Applicant's Gross Salary* " was Ms. Cacciatori's income.[21] Given the circumstances, it was not reckless for Ms. Cacciatori to believe this was the correct manner in which to state her partner's income on the application form.

To summarize, it was not reckless for Ms. Cacciatori to believe that all the material representations she made on the credit application were true. When it is unclear what question on a credit application is asking for, there may well be a wide range of truthful answers to the question. A person who supplies an answer within that range should not be branded reckless or a liar merely because she was unable to read the lender's mind and determine which of the several possible meanings or interpretations the lender intended.

Based upon the foregoing analysis, Ms. Cacciatori did not know at the time that any representation made on the credit application was false within the meaning of the seven part *Candland* test. Although this conclusion of law standing alone disposes of the case, the Court will nonetheless proceed to rule on the application of items (4) and (6) of the *Candland* test as separate and independent reasons for its decision in this case.

### B. ". . . That the Debtor Made With the Intention of Deceiving the Creditor . . ."

■ Intent to deceive a creditor can be inferred from circumstances or from a debtor's conduct. *United States v.*

---

19. R.T. at 54–55.

20. R.T. at 55.

21. R.T. at 55 ("When I reviewed this and I asked him about it, and I did ask him about it, he stated that that's saying $2,200 of the $5,500 is from the partner's income").

*Sandman (In re Sandman)*, 68 B.R. 784, 786–87 (Bankr.D.Mont.1987). An intent to deceive can also be established by a debtor's reckless indifference and reckless disregard of accuracy of information on a financial statement. *Se. Neb. Coop. Corp. v. Schnuelle (In re Schnuelle)*, 441 B.R. 616, 624 (8th Cir. BAP 2011). Based upon the foregoing, the Court concludes that Ms. Cacciatori had no intention of deceiving First Mutual. She made what she believed to be truthful representations on the credit application form and the making of such representations was not reckless in view of the form's vagueness and uncertain and self-contradictory nature. First Mutual misinterpreted these representations, but that was not any fault of Ms. Cacciatori's. Rather, such misinterpretation is at least partly attributable to underlying faults in the credit application form itself.

## C. "... That the Creditor's Reliance Was Reasonable ..."

■ The "reasonable reliance" standard of 11 U.S.C. § 523(a)(2)(B) is a more demanding standard than "justifiable reliance." *In re Morris*, 223 F.3d 548, 552 (7th Cir.2000) (citing *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995)); *Douglas v. Kosinski (In re Kosinski)*, 424 B.R. 599, 611 n. 11 (1st Cir. BAP 2010). This standard requires the court to objectively assess the circumstances to determine whether the creditor exercised that degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances. *Andresen & Arronte PLLC v. Hill (In re Hill)*, 425 B.R. 766, 779 (Bankr.W.D.N.C.2010).

■ This was a low five-figure loan, not a $100 million loan. The Court recognizes the need for streamlined and expedited procedures in making a credit decision on a loan of this magnitude. An involved and complicated credit review could impose costs that would swallow up a lender's profit in making such a loan. Nevertheless, it would not have been burdensome or unduly expensive for First Mutual to have added written instructions to the credit application form addressing the particular income metric (whether AGI or some other metric) that it wanted a self-employed person to state on the form.

Because the credit application form itself is confusing, vague and self-contradictory, it was not reasonable for First Mutual to have relied upon it in the case of the loan made to Ms. Cacciatori. First Mutual should have recognized that a self-employed individual does not have a salary and that if First Mutual wanted information about a self-employed person's income, it needed to specify which among the many income metrics it was seeking, whether gross receipts, AGI, taxable income, EBITDA, EBIT or some other metric. It could not reasonably have expected a loan applicant to read the corporate mind of First Mutual and divine which income metric to use.

## THE PROPOSED SETTLEMENT STIPULATION

Shortly after the trial commenced, counsel for First Mutual asked for a brief recess to determine if the parties could settle the case. The Court granted a recess, and the parties met, conferred and returned to Court to propose a settlement whereby Ms. Cacciatori would stipulate to entry of a judgment for $32,853.87, with a proviso that the judgment would not be executed so long as Ms. Cacciatori paid First Mutual $100.00 per month until the full amount was paid (without postjudgment interest).[22] Counsel for First

---

**22.** At $100.00 per month it would have taken Ms. Cacciatori more than 27 years to pay off

Mutual stated on the record that one of the reasons Ms. Cacciatori was willing to settle the matter on these terms was that she did not want a judgment of fraud entered against her.[23]

 The Court refused to accept such proposed settlement stipulation for two separate and independent reasons. First, there was no reasonable basis for such a settlement based upon a review of the pleadings and the Court's record. "The inherent powers of this Court, embodied in 11 U.S.C. § 105(a), impose a duty on this Court to ensure that the provisions of the [Bankruptcy] Code are carried out and to prevent an abuse of process. In effect, this Court, if it does not review the terms and conditions of a submitted stipulation ... abdicates its duties." *MBNA Amer. Bank v. Panem (In re Panem)*, 352 B.R. 269, 278 (Bankr.D.Colorado 2006). A court is authorized to satisfy itself that there is a reasonable basis for the entry of a consent judgment. *AT&T Universal Card Service v. Bermingham (In re Bermingham)*, 201 B.R. 808, 817 (Bankr.W.D.Mo.1996). Here, there was no reasonable basis for such entry.

Second, the Court cannot and should not approve a settlement stipulation in a section 523(a)(2) matter that does not stipulate that fraud has been committed. *MBNA Amer. Bank*, 352 B.R. at 278; *FIA Card Services v. Moore (In re Moore)*, 2008 WL 2874368 (Bankr.E.D.Ky.2008). Ms. Cacciatori's adamant (and, in the Court's view, totally justified) refusal to admit to fraud [24] precluded the Court from accepting the proposed stipulated settlement.

this obligation.

**23.** R.T. at 41.

## CONCLUSION

Judgment will be entered in favor of Ms. Cacciatori. The indebtedness of Ms. Cacciatori to First Mutual is ordered, decreed and adjudged to be dischargeable in its entirety.